UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


NATHAN MARQUIS LEBARON,
        Plaintiff,


        v.                                         CIVIL ACTION NO. 14-14138-LTS


MASSACHUSETTS PARTNERSHIP
FOR CORRECTIONAL HEALTHCARE,
LYNN GILLIS,
JAMES THOMPSON,
NEAL NORCLIFFE,
KEELIN GARVEY,
JAY TOOMEY,
JOE ZIMAKAS,
LINDA ALBOHN,
PAUL CARATAZZOLA,
MPCH SUPERVISORY AUTHORITIES,
        Defendants.


REPORT AND RECOMMENDATION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT (#182).

KELLEY, U.S.M.J.



I. Introduction.


      Originally filed in the state superior court, this case was removed to the federal court in

November of 2014. When the complaint was filed, plaintiff Nathan Marquis LeBaron was an

inmate in the custody of the Massachusetts Department of Corrections (DOC). He has since been

released.

In Count I of the complaint, LeBaron alleges a claim for retaliation. (#1-2 ¶¶ 153-58.) Count II incorporates claims under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and the First Amendment. *Id.* ¶¶ 160-66. A number of federal constitutional claims under 42 U.S.C. § 1983, and state constitutional claims under Massachusetts General Laws chapter 12, §§ 11H and 11I, are alleged in Count III. *Id.* ¶¶ 168-71. In Count IV, LeBaron asserts a conspiracy claim under 42 U.S.C. § 1985. *Id.* ¶¶ 173-92.

On October 24, 2017, defendants collectively filed a motion for summary judgment, together with a memorandum in support and a statement of undisputed material facts. (##182, 183, 184.) LeBaron has filed no response to the dispositive motion.

## II. Facts.

### A. The Parties.

To the extent that they are supported by the record, defendants' material facts shall be accepted as true.[1] Since July of 2013, defendant Massachusetts Partnership for Correctional Healthcare (MPCH) has been under contract with the Massachusetts DOC to provide certain medical and mental health services to inmates in the custody of the department. (#184 ¶ 2.)[2] At all relevant times, defendant Lynn Gillis, RN, was a Health Services Administrator (HSA) at Massachusetts Correctional Institution – Shirley (MCI-Shirley) and an employee of MPCH. *Id.* ¶ 3. Defendant James Thompson, M.D., was a psychiatrist employed by MPCH. *Id.* ¶¶ 5-6.

---

[1] Local Rule 56.1 provides, in part: "Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties." *See also* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion.").

[2] Unless otherwise noted, reference shall be made to defendants' concise statement of material facts and not the supporting materials.

Defendant Neal Norcliffe, LICSW, was the mental health director at Old Colony Correctional Center (OCCC) and an MPCH employee. *Id.* ¶¶ 5, 9. Defendant Keelin Garvey, M.D., was a psychiatrist at OCCC employed by MPCH. *Id*. ¶¶ 5, 10. Defendant Joseph Toomey, Ph.D., was a psychologist at OCCC and an MPCH employee. *Id*. ¶¶ 5, 11. Defendant Linda Albohn,[3] LPN, was the prisoner Grievance and Appeals Coordinator employed by MPCH. *Id.* ¶¶ 5, 13. Defendant Paul Caratazzola was an HSA at OCCC and an MPCH employee. *Id.* ¶¶ 5, 14.

B. <u>Plaintiff's Grievances</u>.

In a grievance dated February 24, 2014, and received by HSA Gillis on March 5, 2014, LeBaron complained that on February 15, 2014, he had urinated blood and large clots. *Id.* ¶ 16. Gillis responded to LeBaron on March 6, 2014, stating that LeBaron had been evaluated by both nursing staff and a medical provider for his symptoms, and that a doctor would see him for a follow-up appointment. *Id.* On April 11, 2014, LeBaron appealed this grievance; the appeal was received by defendant Albohn on April 29, 2014. *Id.* ¶ 17. In her May 2, 2014 response, Albohn stated that LeBaron's urine sample had been sent to the laboratory for testing and that a doctor would review the results with him. *Id.*

In a June 23, 2014 grievance which was received on June 26, 2014, LeBaron complained to HSA Caratazzola at OCCC that the HSA at MCI-Shirley, defendant Gillis, had ignored a grievance he had allegedly filed on April 11, 2014. *Id.* ¶ 18. In his response four days later, Caratazzola informed LeBaron that his grievance was being forwarded to the HSA at MCI-Shirley for disposition. *Id.* On August 23, 2014, LeBaron appealed this grievance. *Id.* ¶ 19. Albohn

---

[3] Although Albohn's name changed during the course of the litigation, she will continue to be referenced as she was identified in the complaint. (#184 at 2 n. 1.)

received the appeal on August 28, 2014, and responded on September 3, 2014,[4] stating that after a thorough investigation, there was no evidence that plaintiff had filed an April 11, 2014 medical grievance. *Id*. ¶ 19.

In a July 10, 2014 grievance received on July 11, 2014, LeBaron claimed he needed dental braces. *Id.* ¶ 20. Responding on July 14, 2014, Caratazzola stated that he had reviewed LeBaron's medical file and discussed the matter with the dental assistant. *Id*. Plaintiff was advised to submit a sick call request slip to the dental assistant to meet and discuss his concerns. *Id.* LeBaron appealed this grievance on July 20, 2014; the appeal was received by Albohn on August 4, 2014. *Id* ¶ 21. Responding two days later, Albohn advised plaintiff that after investigation and discussion with the dental team, his request for braces would not be granted. *Id*.

LeBaron filed a grievance dated July 22, 2014, which was received by HSA Caratazzola on July 25, 2014, in which plaintiff raised issues about the mental health department. *Id.* ¶ 22. Caratazzola responded on July 29, 2017, explaining that he had discussed plaintiff's concerns with defendant Norcliffe, the Mental Health Director, and that the doctors and the mental health team at OCCC had determined that LeBaron's mental health case should remain open based on clinical information and risk factors. *Id*. Plaintiff's August 4, 2014 appeal of this grievance was received by Albohn on August 25, 2014. *Id*. ¶ 23. Responding two days later, Albohn stated that, in accordance with the mental health team's review, his mental health case would remain open. *Id.*

In a grievance dated July 23, 2014, that was received by HSA Caratazzola on July 30, 2014, LeBaron took issue with certain urology appointments and requested specific medical treatment. *Id.* ¶ 24. Caratazzola responded on July 31, 2014, noting that plaintiff had been examined by the doctor two days previously and that the doctor had submitted a dermatology referral which was

---

[4] Although the date for Albohn's response in the statement of facts is May 2, 2014 (#184 ¶ 19), a review of the actual grievance appeal form (#184, Exh. A at 002) reveals that date to be incorrect.

waiting for approval. *Id.* LeBaron appealed the grievance on August 14, 2014; the appeal was received by the grievance appeals coordinator on August 25, 2014. *Id.* ¶ 25. Albohn responded on August 27, 2014, stating that the request for a dermatological consult was still pending and that plaintiff's request for a biopsy could not be granted at that time. *Id.* Albohn also enclosed a copy of the MPCH grievance and appeal form, which included the new address to which appeals were to be sent. *Id.*

On August 19, 2014, plaintiff filed a grievance regarding a cavity. *Id.* ¶ 26. HSA Caratazzola received the grievance on August 21, 2014, and responded the same day, stating that LeBaron had not reported this issue to any medical personnel and suggested that he submit a sick call request slip. *Id.*[5] Plaintiff appealed the grievance on August 14, 2014, which appeal was received by Albohn on August 28, 2014. *Id.* ¶ 27. Albohn responded on September 3, 2014, stating that she had learned plaintiff had been transferred to another facility and informed him that he must submit a sick call request slip to be seen by a dentist at that institution. *Id.*

During the remainder of 2014, LeBaron filed five grievances and five appeals; Albohn responded to each appeal that was filed. *Id.* ¶ 28.

C. <u>Plaintiff's Medical Treatment</u>.

On February 15, 2014, LeBaron alerted MPCH staff at MCI-Shirley that he was urinating blood. *Id.* ¶ 29. He gave a urine sample that was witnessed by DOC staff, and the nurse performed a urinalysis on it. *Id.* The testing showed that the urine, which was clear yellow, had no indication of blood or any other irregularities. *Id.* Later that same day, plaintiff brought a urine cup of purple-colored liquid to the Health Services Unit (HSU) from population. *Id.* ¶ 30. The registered nurse on duty examined this unwitnessed sample and observed that the liquid had no characteristics of

---

[5] The dates in the material statement of facts do not conform to the dates on this grievance. *Compare* #184 ¶ 26 with #184, Exh. A at 010.

urine; the liquid was opaque, completely purple and had no odor. *Id.* When a urinalysis was performed, no blood was found. *Id.* LeBaron was informed that a urine sample must be collected at, and tested in, the HSU. *Id.*

Four days later on February 19, 2014, LeBaron was seen by the medical staff after complaining that his "urine was pure blood for about a minute and about 20 inches of one-inch-thick blood clots at the end." *Id.* ¶ 31, Exh. B ¶ 6, Exh. 1 at 003. LeBaron spewed profanities and stormed out of the HSU; staff noted he had an "odd affect." *Id.* That same day, in light of his behavior regarding his urine issues, plaintiff met with Roselle Mann, LICSW, for a one-on-one mental health session. *Id.* ¶ 32. LeBaron told Mann that he "was pissing blood" and that the HSU staff "tested it and said it was nothing." *Id.*, Exh. B ¶ 7, Exh. 1 at 004. Plaintiff thought the medical staff was lying to him, stating that he was "almost bleeding to death." *Id.* When Mann empathized, LeBaron started crying. *Id.* Mann was unable to dissuade plaintiff with logic, at which point she noted that he "clearly [had] a persistent fixed delusion and somatoform disorder, probably." *Id.*, Exh. B ¶ 7, Exh. 1 at 005. Mann observed that LeBaron "appeared his baseline self . . . but fixed in his belief that he has a sickness and medical doesn't care (see all notes/sick slips, past medical work-ups that reveal no issues)." *Id.* Plaintiff agreed to meet with Mann on a monthly basis; Mann opened a mental health case on LeBaron. *Id.*

Plaintiff had a urinalysis done on March 4, 2014, that tested positive for blood. *Id.* ¶ 33. The following day plaintiff met with Dr. Hugh Silk, complaining that he had blood and blood clots in his urine, there was a delay in getting a urine sample and there was a conspiracy against him. *Id.* Dr. Silk noted that while the urinalysis was positive for blood, it was negative for anything else. *Id.* He determined that plaintiff's blood and urine should be retested with a follow-up in two weeks. *Id.*

On March 10, 2014, Elizabeth Louder, LICSW, completed a Mental Health Status Update on plaintiff to evaluate his suitability to go into segregation due to his involvement in a physical altercation. *Id*. ¶ 35. While LeBaron had a provisional diagnosis of delusional disorder, Louder saw no sign of delusions during her meeting with him. *Id*. Plaintiff denied suicidal ideation, intent or plan. *Id*. Louder concluded that plaintiff presented with a low risk for self-harm, but had mild paranoia at the time of evaluation and overall displayed symptoms consistent with somatic delusions. *Id*. Two days later LeBaron was placed on a mental health watch, meaning that his mental health was to be monitored more closely. *Id*. ¶ 36. This change in status resulted from his expression of delusional thinking and concern for his safety in the special management unit (SMU). *Id*.

On March 12, 2014, Mann completed a crisis treatment plan for plaintiff's mental health watch. *Id*. ¶ 37. She wrote that LeBaron was "beat up in a fight" two nights earlier, and that he felt despairing, unsafe, and "physically and emotionally dying." *Id*. Plaintiff was noted as having a history of suicidal behavior, and he expressed belief in delusions that he was very sick and that the DOC was conspiring to cover his illness. *Id*. LeBaron believed that he had lost two quarts of blood through his penis and that he "wouldn't mind if God sent him on a mission to war … and [he] died honorably in battle." *Id*. While plaintiff enjoyed a positive rapport with Mann, historically he was paranoid with other medical and mental health staff. *Id*. Mann placed plaintiff on a mental health watch so he would be monitored until the next morning when a psychiatrist could evaluate him for an 18(a) admission[6] to Bridgewater State Hospital (BSH), a psychiatric care facility controlled by the DOC. *Id*.

---

[6] An 18(a) admission refers to a Massachusetts statute which provides, in relevant part:

Mann completed an 18(a) Referral for LeBaron on March 12, 2014. (#184 ¶ 39.) The stated reasons for the referral were that plaintiff :

> appears to have decompensated significantly with the past few weeks with increasingly bizarre beliefs and delusions. He appears unable to function within population or SMU, unable to keep himself safe. . . . [He] has had long-standing ideas about his physical ailments since 2010 that seem to have dramatically exacerbated within the past few weeks with persistent fixed delusions worsening.

*Id.* After reiterating that plaintiff appeared to be quickly decompensating, delusional and despairing, Mann requested that the BSH treatment team address the following questions: 1. Is the inmate presenting with a delusional disorder?  2. Would medication be helpful? 3. What treatment recommendations would the team make? 4. How can this inmate be helped to cope with prison life? *Id.*

LeBaron was seen by Jeffrey Vanderyacht, LMHC, before his transfer to BSH on March 13, 2014. *Id.* ¶ 40. Plaintiff expressed the belief that he had a serious disease but that the medical staff was covering it up, deliberately destroying evidence and inciting other inmates to harass him. *Id.* Vanderyacht recorded that plaintiff wanted to go into population where he was likely to be assaulted, stating "I'm willing to sacrifice myself for a noble cause . . . I'd rather be beaten to a bloody pulp than deteriorate slowly." *Id.* Vanderyacht determined LeBaron should be referred for

---

If the person in charge of any place of detention within the commonwealth has reason to believe that a person confined therein is in need of hospitalization by reason of mental illness . . . at the Bridgewater state hospital, he shall cause such prisoner to be examined at such place of detention by a physician or psychologist, designated by the department as qualified to perform such examination. Said physician or psychologist shall report the results of the examination to the district court which has jurisdiction over the place of detention. . . . Such report shall include an opinion, with reasons therefore, as to whether such hospitalization is actually required.  The court which receives such report may order the prisoner to be taken . . . to the Bridgewater state hospital to be received for examination and observation for a period not to exceed thirty days.

Mass. Gen. L. c. 123, § 18(a); (#184 ¶ 38.).

psychiatric evaluation to be considered for an 18(a) transfer for evaluation and inpatient treatment. *Id*.

On March 13, 2014, Dr. James Thompson evaluated plaintiff pursuant to Mass. Gen. L. c. 123 § 18(a) for transfer to BSH. *Id*. ¶ 41. In conducting this evaluation, Dr. Thompson reviewed plaintiff's medical records, spoke with Vanderyacht and interviewed LeBaron. *Id*. Dr. Thompson related that in support of his alleged severe kidney infection, plaintiff had recently presented health services staff with a urine cup he claimed was filled with bloody urine, but analysis revealed it contained neither blood nor urine. *Id*. Plaintiff then presented a specimen he claimed was part of his liver or a clot, but it was neither. *Id*. Dr. Thompson noted LeBaron's history of paranoid delusions as well as his belief that there was a conspiracy to ignore his medical problems when there was no concrete evidence of a medical problem. *Id*. Plaintiff presented with these somatic complaints and increased agitation. *Id*.

LeBaron had been placed in SMU after a fight with a friend over a typewriter ribbon, and he had decompensated further. *Id*. Dr. Thompson noted that plaintiff had stated he planned to put himself in a situation with other inmates where he could get harmed or killed. *Id*. During his interview, plaintiff had noticeable psychomotor agitation, he was tangential in his thought patterns, and his judgment and insight were impaired. *Id*.

Dr. Thompson agreed with the previous diagnosis of delusional disorder and PTSD. *Id*. He opined that plaintiff could not be managed in his current setting at MCI-Shirley, and that he should be transferred to BSH for evaluation and treatment. *Id*.

Jean Berggren, M.D., is the Director of Psychiatry and Behavioral Health for Centurion, LLC. (#184, Exh. B ¶ 1.) Dr. Berggren is board certified in psychiatry, and is familiar with the practice of psychiatry in the penal setting, having worked for the contracted medical and mental

health provider for the Vermont Department of Corrections as the Director of Psychiatry and Behavioral Health since 2015. *Id*., Exh. B ¶¶ 1-2. Dr. Berggren reviewed and was familiar with plaintiff's medical and mental health records from February 15, 2014 to April 4, 2014. *Id*., Exh. B ¶ 3. In Dr. Berggren's clinical opinion:

> The mental health providers at MCI-Shirley provided [plaintiff] with the care clinically indicated for his conditions and were not deliberately indifferent to [plaintiff's] serious medical needs. After reviewing the documents Dr. Thompson relied upon in making his 18(a) evaluation, Dr. Thompson properly referred [plaintiff] for further psychiatric care at BSH. [Plaintiff] received appropriate and adequate care from the mental health staff at MCI-Shirley from February 15, 2014 to March 13, 2014.

*Id.*, Exh. B ¶ 17.

## D. Bridgewater State Hospital.

On March 13, 2014, LeBaron was transferred to BSH pursuant to Mass. Gen. L. c. 123 § 18(a). *Id.* ¶ 43. The Admission Note authored by Brittany Irwin, LCSW, reflects that Vanderyacht called her at BSH before plaintiff was transferred to report clinical issues. *Id.* In addition to reviewing plaintiff's recent mental health issues, Irwin noted that plaintiff had a provisional diagnosis[7] of delusional disorder and PTSD. *Id.*

Plaintiff was evaluated by Dr. Christopher Myers upon admission to BSH on March 13, 2014. *Id.* ¶ 44. According to Dr. Myers, plaintiff told him that he had urinated two quarts of blood and large chunks of what looked to be pieces of his liver, and that this "evidence" had been discarded. *Id.* Plaintiff presented as unstable, hyperactive and paranoid with limited insight/judgment. *Id.* He had a rapid rate of speech and a tangential thought process. *Id.* He appeared agitated; presented as emotionally labile; and was noted to have thought disorganization

---

[7] "A provisional diagnosis is one to which the clinician is not yet committed and needs more information to confirm." (#184, Exh. B ¶ 18.)

and somatic delusions. *Id.* Dr. Myers deemed plaintiff to be an imminent risk of serious harm to others. *Id*.

Plaintiff was held in seclusion throughout the night of March 13, 2014, into the morning of March 14, 2014. *Id.* ¶ 45. At three different times during the night and early morning hours, medical staff attempted to assess him, but he was sleeping. *Id*. ¶¶ 46-48. At 8:10 a.m. on March 14, 2014, Dr. Andrey Gagarin was able to evaluation LeBaron. *Id.* ¶ 49. He communicated in an angry, hyperverbal manner and was visibly disturbed. *Id.* Plaintiff believed he had multiple injuries and no one cared. *Id.* He was viewed as suffering from continued distress and agitation surrounding his delusional beliefs. *Id*. Dr. Gagarin found plaintiff was at substantial risk of committing serious physical assault and serious destructive behavior. *Id.* The doctor prescribed an intramuscular injection of Haldol and Benadryl, and approved the use of four point restraints to facilitate the administration of emergency involuntary treatment for LeBaron. *Id.* ¶ 50.

After being placed in restraints, plaintiff was checked by a nurse, was administered the medication fifteen minutes later, and was monitored by a mental health worker throughout the process. *Id*. He was released from the restraints immediately after the injections; he was in the restraints for a total of seventeen minutes. *Id.* Plaintiff continued to be monitored by the nursing staff. *Id.* ¶ 51.

At 2:00 p.m. on March 14, 2014, plaintiff was again examined by Dr. Gagarin. *Id*. He was described as calm, cooperative and apologetic. *Id.* The doctor concluded he had improved sufficiently to be released from seclusion. *Id.* Although Dr. Gagarin ordered Risperidone at bed time that evening, plaintiff refused the medication and he was not forced to take it. *Id.* ¶ 52.

In Dr. Berggren's clinical opinion,

[A]t 8:00 AM on March 13, 2014,[8] [plaintiff] required emergency psychiatric medication to prevent immediate and substantial deterioration in his medical condition. [Plaintiff] presented as an imminent risk of serious harm to others, and presented with a serious threat of extreme violence and personal injury. . . .

Dr. Gagarin acted appropriately in administering emergency medication for [plaintiff] given that [plaintiff] had been experiencing delusional beliefs prior to admission to BSH, his distress had been escalating to the extent that he required admission to BSH and was placed in seclusion, and given the risk of continued and possibly irreversible decline in his symptoms and mental illness. . . . Plaintiff was unable to make informed medical decisions on his own behalf. Dr. Gagarin provided [plaintiff] with the care clinically indicated for his condition and was not deliberately indifferent to [plaintiff's] serious medical needs.

*Id.* ¶¶ 54, 55.

On April 10, 2014, LeBaron was transferred from BSH to MCI-Shirley. *Id.* ¶ 56. That same day Louder completed a mental status update on plaintiff, noting that he stated he was on a fast. *Id.* ¶ 57. On April 15, 2014, plaintiff was transferred to OCCC. *Id.* ¶ 58.

### E. Old Colony Correctional Center.

On the day he arrived at OCCC, plaintiff was interviewed by Joseph Zimakas, LICSW. *Id* ¶ 58. LeBaron stated that he did not need mental health services and requested that his case be closed. *Id.* Zimakas detailed the process by which a mental health case was closed, and plaintiff indicated his understanding. *Id.* LeBaron's mental health case remained open. *Id.* The following day plaintiff submitted a sick call request form wherein he wrote, "Very eager to meet with the MH worker appointed to help me work towards closing this 'open mental health case.'" (#184, Exh. C at 007.)

On April 23, 2014, plaintiff submitted a sick call request form about closing his mental health case so he could be transferred to MCI-Norfolk where there was a synagogue. (#184 ¶ 60.) Two days later he met with Vanessa Martino-Fleming, LMHC, who explained the case closure

---

[8] This date is incorrect. The medical records reflect that the date was March 14, 2014. *See* #184, Exh. B, Exh.1 at 039.

protocol and suggested plaintiff follow up with his primary care clinician. *Id*. LeBaron submitted a sick call request form on May 9, 2014, stating that he had yet to see the clinician doctor about closing his mental health case. *Id.* ¶ 62.

On May 12, 2014, plaintiff met with Joseph Toomey, Ph.D., who explained the health services available at OCCC. *Id.* ¶ 63. Dr. Toomey told plaintiff he would discuss the status of his mental health case with the mental health director and psychiatry so as "to make an informed decision regarding [plaintiff's] need for mental health services." *Id*. Dr. Toomey drafted an initial treatment plan for LeBaron on May 29, 2014. *Id.* ¶ 64. His primary diagnosis was adjustment disorder with mixed disturbance of emotions and conduct. *Id*. The doctor indicated that he planned to meet with plaintiff every thirty days, and set a target date of July 23, 2014, for resolution. *Id*. In the interim, plaintiff's status would be monitored by the mental health team in order to assess his adjustment and need for services. *Id.*

On June 3, 2014, plaintiff wrote a letter to Dr. Toomey stating he would like to meet with a psychiatrist so his mental health case could be closed and he could be transferred to MCI-Norfolk where he would have access to typewriters and a law library. *Id.* ¶ 65. On June 9, 2014, Dr. Toomey met with plaintiff for their monthly appointment and gave him a copy of the initial treatment plan. *Id.* ¶ 66. While plaintiff understood the mental health staff's obligation to monitor him, he disagreed that he suffered from any mental illness. *Id*. Dr. Toomey planned to follow up with psychiatry and to continue to monitor plaintiff. *Id*.

Plaintiff met with a psychiatrist, Dr. Keelin Garvey, on June 23, 2014. *Id.* ¶ 67. Dr. Garvey noted LeBaron's diagnosis of adjustment disorder at BSH which he thought was not clearly supported, and antisocial personality disorder, which he thought was accurate. *Id.* Dr. Garvey was also concerned about possible delusional disorder. *Id.* Dr. Garvey planned to gather more

information to evaluate and clarify the diagnosis; in his opinion, closure of plaintiff's mental health case was not appropriate at that time. *Id.* LeBaron submitted a sick call request form on June 23, 2017, requesting the official reason why he had an open mental health case. *Id.* ¶ 68. Three days later plaintiff submitted another sick call request form in which he stated he would be observing a complete religious fast until his mental health case was closed. *Id*. ¶ 69.

Plaintiff attended his monthly appointment with Dr. Toomey on July 1, 2017. *Id.* ¶ 70. LeBaron was frustrated that his mental health case was still open, but Dr. Toomey told him that the mental health team had concerns about the circumstances that led to his transfer to OCCC and they would continue to monitor him. *Id.* On July 12, 2014, Zimakas, the social worker, drafted a mental status update on plaintiff due to a hunger strike, which plaintiff described as a religious fast. *Id*. ¶ 71. Three days later on July 15, 2017, Zimakas drafted another mental status update on plaintiff who had broken his fast because he did not want to "lock horns" with the DOC. *Id.* ¶ 72.

On July 18, 2014, Dr. Toomey met with plaintiff in segregation. *Id*. ¶ 73. After being presented with his diagnosis, plaintiff became agitated and used profanities. *Id.* When LeBaron did not allow Dr. Toomey to speak, the doctor terminated the contact. *Id.* That same day plaintiff drafted a letter to Dr. Toomey using profanities and denigrating the mental health staff at OCCC. *Id.* ¶ 74. He accused the mental health staff of creating fake labels for him, stating he would overreact just as they said he did. *Id*. Plaintiff also submitted a sick call request form demanding a list of the specific actions he took to justify a "non-specific" diagnosis of personality disorder. *Id.* ¶ 75.

Dr. Toomey met with plaintiff in segregation on July 24, 2014. *Id.* ¶ 76. LeBaron accused the doctor of "raping" him with a manufactured diagnosis, and that the mental health team had worked together to deny him the right to practice his religion. *Id.* Plaintiff wanted his case closed,

threatened to sue, and stated he would no longer speak with the mental health staff. *Id.* Dr. Toomey advised that because he engaged in concerning behaviors, it was difficult to assess the propriety of adjusting his mental health status. *Id*. Dr. Toomey planned to meet with plaintiff again, and the plaintiff could refuse to speak if he so chose. *Id.*

On July 31, 2014, Dr. Toomey attempted to meet with plaintiff in segregation, but plaintiff would only say, "I'm all set." *Id.* ¶ 77. The doctor planned to meet with plaintiff again on August 8, 2014, if he was still in segregation, or otherwise in thirty days. *Id*. Zimakas offered LeBaron mental health services in his cell in segregation on August 8, 2014, which plaintiff refused, telling Zimakas that he could "take his 'psychology' and 'opinions' and 'shove them up [his] ass.'" *Id.* According to plaintiff, being labeled with a personality disorder was insulting to his religion, and that he would sue Zimaskas for offering mental health contacts in segregation. *Id* ¶ 78. When Dr. Toomey attempted to meet with LeBaron in segregation on August 12, 2014, plaintiff waived his hand and continued reading with no further response. *Id* ¶ 80. When Zimakas knocked on plaintiff's cell in segregation to offer mental health services on August 22, 2014, plaintiff was lying on his mattress reading and did not respond in any way. *Id.* On August 26, 2014, plaintiff was transferred to MCI-Norfolk. *Id.* ¶ 81.

F. <u>Miscellaneous Facts</u>.

In his answers to interrogatories, plaintiff stated that from January 1, 2014, through the time he supplemented his responses, he practiced "Messianic Judaism from the perspective of my church, CFB, by local halachah (religious law) of CVB." *Id.*, Exh. D at 23. The CFB, or Church of the Firstborn Kahal Hab'cor, was incorporated by LeBaron on November 7, 2014, after plaintiff left OCCC. *Id.* ¶ 88. According to LeBaron, in his "official capacity as President, Corporation Sole and Chief Judge of CFB's Beit Din (religious court)," his "spoken or written word . . . is religious

law and is a final judgment based on jurisdiction over [himself] as to all spiritual matters." *Id.*, Exh. D at 23. While incarcerated, plaintiff practiced Messianic Judaism by participating in "[l]iturgical prayers with Hebrew text, personal prayers, personal Bible study, Shabbat observance with outside volunteer . . . , kosher diet observance, [and] reading Messianic publications when available." *Id.*, Exh. D at 25.

Dr. Thompson had not examined plaintiff prior to his treatment on March 13, 2014. *Id.* ¶ 84. Plaintiff claims Dr. Thompson sent him to BSH by inventing "blatant lies" to justify the transfer. *Id.* ¶ 82.

III. <u>Summary Judgment Standard</u>.

The purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Rojas-Ithier v. Sociedad Espanola de Auxilio Mutuo y Beneficiencia de Puerto Rico*, 394 F.3d 40, 42 (1st Cir. 2005) (internal quotation and citation omitted). When considering a motion for summary judgment, "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003) (citations omitted). "Once the moving party avers the absence of genuine issues of material fact, the non-movant must show that a factual dispute does exist, but summary judgment cannot be defeated by relying on improbable inferences, conclusory allegations, or rank speculation." *Fontánez-Núñez v. Janssen Ortho LLC*, 447 F.3d 50, 54-55 (1st Cir. 2006) (internal quotation and citation omitted).

In determining whether summary judgment is proper, "a court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." *Clifford v. Barnhart*, 449 F.3d 276, 280 (1st Cir. 2006). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quotation omitted)).

## IV. Discussion.

### A. Federal Claims.

#### 1. Count One – Retaliation.

In Count One, an omnibus claim for retaliation against plaintiff for exercising his constitutional rights, actionable under § 1983, is alleged. The elements of the claim are straightforward: "[I]n order to survive summary judgment on a retaliation claim, a prisoner must make out a prima facie case by adducing facts sufficient to show that he engaged in a protected activity, that the state took an adverse action against him, and that there is a causal link between the former and the latter." *Hannon v. Beard*, 645 F.3d 45, 48 (1st Cir. 2011) (internal quotation marks and citation omitted); *Hudson v. MacEachern*, 94 F. Supp. 3d 59, 68 (D. Mass. 2015). With respect to causation, "a prisoner must prove that the [adverse] action would not have been taken 'but for' the alleged improper reason." *L'Heureux v. Whitman*, 125 F.3d 841, 1997 WL 639324, at *1 (1st Cir. 1997) (per curiam) (unpublished opinion). Further, the First Circuit has emphasized

that "because running a prison system is a difficult enterprise and because prisoner claims of retaliation are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, such claims must be based on facts, not on gossamer strands of speculation and surmise." *LeBaron v. Spencer*, 527 F. App'x 25, 32 (1st Cir. 2013) (internal citations and quotation marks omitted).

a. Defendants Dr. Thompson and Gillis.

Dr. Thompson is alleged to have taken adverse action against plaintiff, i.e., sending him to BSH without justification, for having filed "his 3/4/2014 religious and medical lawsuit." (#1-2 ¶ 154.) Gillis is said to have conspired with Dr. Thompson to refuse to process any grievances LeBaron filed.[9] *Id.*

After reviewing LeBaron's relevant medical and mental health records, Dr. Berggren opined that Dr. Thompson "properly referred [plaintiff] for further psychiatric care at BSH." (#184, Exh. B ¶ 4.) This expert medical opinion is unrefuted. With respect to Gillis, the record shows that she responded to the grievance she received from plaintiff, in which he complained he was urinating blood and clots.

Even assuming that actions taken by these defendants were adverse, plaintiff has proffered no facts or evidence to suggest that Dr. Thompson or Gillis acted for a retaliatory purpose. There is a disconnect between Dr. Thompson and the prior litigation: Dr. Thompson was not named as a party in the earlier lawsuit, and there is no evidence that Dr. Thompson's actions were motivated in any way by that litigation. While Gillis was a party in the previous suit, there is no evidence or

---

[9] The filing of lawsuits and grievances constitutes protected activity. *Hannon,* 645 F.3d at 48; *Tibbs v. Samuels*, No. CV 13-11095-DJC, 2017 WL 1164484, at *4 (D. Mass. Mar. 28, 2017).

supportable inference that she refused to process grievances on account of that litigation. No facts have been submitted to support a conspiracy between Dr. Thompson and Gillis.

In the absence of any evidence of retaliatory intent, causation or conspiracy, summary judgment should enter in favor of defendants Dr. Thompson and Gillis on Count One.

b. Unknown BSH Defendants.

In the complaint, plaintiff contends that when he asserted his legal right to refuse drugs, the unknown BSH defendants "drastically increased the dosage and forcibly injected plaintiff, and a couple of hours later forced him to take another pill."[10] (#1-2 ¶ 155.)

The claim against the unknown BSH defendants should be dismissed. There is no evidence that anyone forced medications on plaintiff for other than legitimate medical reasons. Dr. Berggren has opined that the personnel at BSH administered appropriate emergency psychiatric medication to arrest LeBaron's deteriorating condition. This expert opinion stands unrebutted; there is no evidence of retaliatory intent by anyone at BSH.

The unknown BSH defendants are entitled to the entry of summary judgment in their favor on Count One.

c. Defendants Toomey and Zimakas.

Plaintiff claims that when he asserted his First Amendment right to refuse psychological treatment,[11] defendants Toomey and Zimakas increased "their harassments and the frequency of their unwanted visits" in retaliation. (#1-2 ¶ 156.)

---

[10] Contrary to plaintiff's allegation, the medical record is clear that the only involuntary medications given plaintiff were the injections of Haldol and Benadryl on a single occasion. When LeBaron refused to take Risperidone, it was not forced on him.

[11] For purposes of this claim, the court will assume, without deciding, that plaintiff had a First Amendment right to refuse psychological treatment.

Nothing Toomey or Zimakas did prevented plaintiff from refusing treatment. In fact, the record shows that when these defendants attempted to meet with plaintiff in segregation to offer mental health services, he either declined treatment, said he was all set, or did not respond at all. Defendants' actions were not adverse. Offering mental health services, as they were contracted to do, does not constitute an adverse action. There are no facts to suggest that Toomey or Zimakas were doing anything more than performing their duties as mental health personnel; there is no evidence of retaliation.

Summary judgment should enter for defendants Toomey and Zimakas on Count One.

d. Defendants Caratazzola and Albohn.

According to plaintiff, defendants Caratozzola and Albohn retaliated against him by refusing to process his grievances so as to impede his access to the courts. (#1-2 ¶¶ 157-58.) There is no evidence that LeBaron's grievances were not processed. To the contrary, the record shows that defendant Caratazzola processed, and responded to, five of plaintiff's grievances while he was housed at OCCC in 2014. In the same year, as MPCH's Grievance and Appeal Coordinator, Albohn processed, and responded to, eleven grievances appealed by plaintiff. In the absence of proof that defendants Caratazzola and Albohn took any adverse action against him by refusing to process his grievances, his retaliation claim must fail.[12]

Summary judgment should enter for defendants Caratazzola and Albohn on Count One.

2. Count Two – Religious Land Use and Institutionalized Persons Act (RLUIPA) and First Amendment.

In Count Two, LeBaron alleges violations of RLUIPA, and First Amendment violations relating to his free exercise of religion. Plaintiff contends that "Dr. Thompson imposed a substantial burden on plaintiff's exercise of his religion" by using "a phony mental label of

---

[12] As this lawsuit makes clear, plaintiff has exercised his constitutional right to access the court.

'somatic delusions' to have him transferred to BSH to be injected with drugs by force and to be coerced to take drugs." (#1-2 ¶ 161.) LeBaron claims that "Unknown BSH Persons imposed a substantial burden on plaintiff's exercise of his religious belief that he should never take 'mental health' drugs." *Id.* ¶ 162. Finally, it is alleged that "[d]efendants Norcliffe, Garvey, Toomey, Zimakas, Albohn and Caratazzola imposed a substantial burden on plaintiff's religious belief that he should never speak to 'mental health' persons." *Id.* ¶ 164.

a. RLUIPA.[13]

In part, RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
> (1) is in furtherance of a compelling governmental interest; and
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a)(1)-(2). Section 3 of RLUIPA applies whenever "the substantial burden on religious exercise is imposed in a program or activity that receives federal financial assistance." 42 U.S.C. § 2000cc–1(b)(1); *Kuperman v. Wrenn*, 645 F.3d 69, 79 (1st Cir. 2011).[14] To make out a claim, "a RLUIPA plaintiff bears the burden of demonstrating that he or she wishes to engage in

---

[13] There may be no relief available to plaintiff under his RLUIPA claim because he is no longer incarcerated. Although the First Circuit has yet to address the issue, two district judges in Massachusetts have held "that state immunity limits plaintiffs to injunctive relief only under RLUIPA." *Hudson v. Spencer*, 180 F. Supp. 3d 70, 78 (D. Mass. 2015); *see also Cryer v. Spencer*, 934 F. Supp. 2d 323, 334 (D. Mass. 2013) ("In the absence of First Circuit directives on this issue, this Court aligns itself with the majority of appellate courts holding RLUIPA does not provide for monetary damages against defendants in their individual capacities, as the bases for that conclusion are sound."). This court will nevertheless in the interest of completeness analyze the claim. LeBaron's prayers to enjoin the defendants from taking actions against him, i.e., "[e]njoin any MPCH 'mental health' dept. employee or anyone else in the 'field' of 'mental health' from forcibly injecting plaintiff with any drugs" (#1-2 at 38), are moot.

[14] MPCH defendants contend that RLUIPA is inapplicable to them because, as employees of a private company, they receive no federal funding.

(1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government." *LeBaron*, 527 F. App'x. at

28 (internal quotation marks and citations omitted); *Holt v. Hobbs*, - U.S. -, 135 S. Ct. 853, 862 (2015); *Spratt v. Rhode Island Dept. Of Corrections*, 482 F.3d 33, 38-42 (1st Cir. 2007). By definition, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5. "A 'substantial burden' is defined as one in which the government puts 'substantial pressure on an adherent to modify his behavior and to violate his beliefs . . . .'" *Cryer v. Spencer*, 934 F. Supp. 2d 323, 331 (D. Mass. 2013) (*quoting Thomas v. Review Bd. of Indiana Employment Sec. Division*, 450 U.S. 707, 718 (1981).). The statute allows examination of the "sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13 (2005).

There are no facts or expert testimony in the record to establish what constitutes the religious belief system of Messianic Judaism, the religion plaintiff practiced when he was incarcerated.[15] While alleging that taking mental health drugs and talking with mental health professionals is prohibited by his religion, plaintiff has proffered no evidence, such as an affidavit from a rabbi, to show that repudiation of mental health treatment is a protected religious exercise of Messianic Judaism. If LeBaron is claiming that the activities of the mental health professionals treating him violated a religious law of his church, CFB, that church was not incorporated until approximately three months after he was transferred out of OCCC. The religious law of CFB,[16] to the extent it is cognizable as religious law, is inapplicable to the events at issue in this litigation.

---

[15] Plaintiff specifically alleges that he "was born a Mormon fundamentalist and is a believer in restored truth of Messianic Judaism. (#1-2 ¶ 173.)

[16] Plaintiff alleges that his own written and spoken word is the religious law of CFB. LeBaron's "purely subjective ideas of what his religion requires will not suffice." *Guzzi v. Thompson*, 470 F. Supp. 2d 17, 26 (D. Mass. 2007), *vacated and remanded on other grounds*, No. 07-1537, 2008 WL 2059321 (1st Cir. May

Plaintiff also has failed to raise a genuine issue of material fact regarding whether his belief was sincerely held. The record reflects that he met with, and spoke to, mental health professionals until July 18, 2014, when he received a diagnosis from Dr. Toomey which he found insulting.[17] It was only after July 18, 2014, that plaintiff stated he would no longer speak to members of the mental health staff and objected to their interaction with him.

LeBaron has not proffered any evidence that his religious exercise was substantially burdened, but, even assuming he had, the defendants have demonstrated that the provision of mental health services "(1) [was] in furtherance of a compelling governmental interest; and (2) [was] the least restrictive means of furthering that compelling governmental interest." *Holt*, 135 S. Ct. at 863; *Spratt*, 482 F.3d at 38. MPCH was contractually obligated to provide medical and mental health services to inmates in the custody of the DOC. A medical expert has opined, without contradiction, that Dr. Thompson acted appropriately in referring plaintiff to BSH for further psychiatric care when his deteriorating mental condition could not be managed properly at MCI-Shirley. The forced injection of emergency psychiatric medication at BSH was necessary to avoid further deterioration, or an irreversible decline, in plaintiff's mental condition. It is uncontroverted that LeBaron "presented as an imminent risk of serious harm to others, and presented with a serious threat of extreme violence and personal injury." (#184 ¶ 554.)

There can be no doubt that "prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Spratt*, 482 F.3d at 39 (*quoting Cutter*, 544 U.S. at 725 n.13.). Defendants acted in response to LeBaron's declining mental status, which posed

---

14, 2008) (*citing Wisconsin v. Yoder*, 406 U.S. 205, 215–15 (1972) (recognizing for purposes of a First Amendment inquiry that individuals are not free to define religious beliefs solely based upon individual preference).).

[17] LeBaron submitted at least two sick call request forms seeking to meet with mental health professionals.

an imminent risk to himself and others. Their actions were in furtherance of a compelling penological interest: the physical safety of plaintiff, staff and other inmates. Moving plaintiff to a secure environment and administering emergency psychiatric drugs via injection was "clinically indicated for his condition," (#184 ¶ 55), and the least restrictive way to address a burgeoning mental health crisis.

The record shows that defendants did not force mental health sessions or discussions on plaintiff. Again, MPCH personnel were under contract to provide mental health services, and plaintiff had an open mental health case. They had a strong interest in monitoring the status of LeBaron's mental health so as to avoid a downward spiral and potential threat of violence. When mental health staffers visited plaintiff and he refused treatment, the mental health workers did not try to engage him against his will. Had the mental health providers not offered services to plaintiff when he had an open mental health case, they would have run afoul of the constitution. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("elementary [Eighth Amendment] principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met.").

Summary judgment should enter for defendants on the RLUIPA claim in Count Two.

b. First Amendment.

The Supreme Court has long held that:

Inmates clearly retain protections afforded by the First Amendment including its directive that no law shall prohibit the free exercise of religion. Second, lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives-including deterrence of crime, rehabilitation of prisoners, and institutional security.

*O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citations, quotation marks and alterations omitted). As with the RLUIPA claim, plaintiff has not stated any material facts in dispute on the issue of whether his free exercise of a sincerely held religious belief has been constrained. *See Brown-El v. Harris*, 26 F.3d 68, 69 (8th Cir. 1994) ("In a claim arising under the First Amendment's Free Exercise Clause, an inmate must first establish that a challenged policy restricts the inmate's free exercise of a sincerely held religious belief."); *Daly v. Davis*, No. 08-2046, 2009 WL 773880 (7th Cir. Mar. 25, 2009); *Shaheed-Muhammad v. Dipaolo*, 393 F. Supp. 2d 80, 90 (D. Mass. 2005). Even if he had, as explained above, defendants have established that they furthered a compelling interest in institutional security by providing medical and mental health care services to plaintiff in the least restrictive way. *Daly*, 2009 WL 773880, at *2. For the reasons set out in the RLUIPA analysis, defendants' actions were reasonably related to legitimate DOC interests. *See Hudson v. Spencer*, 180 F. Supp. 3d 70, 83–84 (D. Mass. 2015).[18]

Summary judgment should enter for defendants on the First Amendment claim in Count Two.

### 3. Count Three - Section 1983.[19]

In Count Three, plaintiff claims that defendants violated his rights under the Fourteenth, Fifth, First and Eighth Amendments.

a. Fourteenth Amendment.

---

[18] Since no prison regulation is at issue in this case, there is no need to examine the factors laid out in *Turner v. Safley*, 482 U.S. 78, 89-90 (1978); *Kuperman v. Wrenn*, 645 F.3d 69, 74 (1st Cir. 2011) ("The factors relevant in deciding the regulation's constitutionality are: (1) whether there is a valid, rational connection between the regulation and the legitimate government interest put forward to justify it; (2) whether alternative means to exercise the right exist; (3) the impact that accommodating the right will have on prison resources; and (4) the absence of alternatives to the prison regulation.").

[19] Plaintiff's state law claims under the Massachusetts Civil Rights Act (MCRA) are addressed separately.

Defendants are said to have violated plaintiff's Fourteenth Amendment rights (1) to refuse forced injections of antipsychotic drugs, to be free from restraints, and to have informed consent before the forcible injection; (2) to refuse mental health therapy and to avoid fraudulent mental labels; and (3) to be free from transfer to BSH in non-emergency situations. (#1-2 ¶¶ 168, 170.)

The Supreme Court has held "that, given the requirements of the prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest*." Washington v. Harper*, 494 U.S. 210, 227 (1990). Here, Dr. Berggren's affidavit establishes that those criteria have been met.

In his clinical opinion, Dr. Berggren states that Dr. Thompson "properly referred [plaintiff] for further psychiatric care at [BSH]." (#184, Exh. B ¶ 17.) At BSH, plaintiff "required emergency psychiatric medication to prevent immediate and substantial deterioration in his medical condition. . . . [as he] presented as an imminent risk of serious harm to others, and presented with a serious threat of extreme violence and personal injury . . . ." (#184 ¶ 54.) The use of four-point restraints were approved by Dr. Gagarin to facilitate the administration of emergency involuntary treatment; LeBaron was in restraints for a total of seventeen minutes, during which time he was monitored by medical staff. In Dr. Berggren's opinion, Dr. Gagarin "acted appropriately in administering emergency medication" given plaintiff's deteriorating medical condition. (#184 ¶¶ 54, 55.) The DOC had a legitimate penological interest in having plaintiff diagnosed and treated for his own safety, and to ensure the safety of other inmates and staff.

Plaintiff has failed to raise a genuine issue of material fact on any alleged violation of his Fourteenth Amendment rights.

b. Fifth Amendment.

There can be no Fifth Amendment violation because the defendants are not federal actors. *See Martinez-Rivera v. Sanchez Ramos*, 498 F.3d 3, 8 (1st Cir. 2007) ("The Fifth Amendment Due Process Clause, however, applies 'only to actions of the federal government—not to those of state or local governments.'") (*quoting Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001)); *Brown v. Lucas*, No. CV 16-10977-GAO, 2017 WL 1227921, at *2 (D. Mass. Mar. 31, 2017).

c. First Amendment.

This claim is essentially a rehash of other claims, i.e., that the defendants violated plaintiff's right to file grievances and lawsuits, and interfered with his right to exercise his religion. As noted previously, plaintiff has proffered no evidence to show that defendants infringed his First Amendment rights by impeding his ability to file grievances or access the courts. To the extent it is contended that the forcible injection of antipsychotic medications interfered with plaintiff's exercise of free thought, LeBaron has offered nothing to contradict defendants' showing that his medical treatment was appropriate, and the emergency administration of drugs at BSH was medically necessary.

d. Eighth Amendment.

Plaintiff essentially alleges that defendants were deliberately indifferent to his medical needs because they failed to give a "proper medical diagnosis and treatment without interference by fraudulent labels intended to contradict scientific facts of his urinating blood and blood clots." (#1-2 ¶ 170 (11).)

The First Circuit has stated that: "[T]o prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014); *Knox v.*

*Massachusetts Dep't of Correction*, No. CV 14-12457-LTS, 2017 WL 3401443, at *16 (D. Mass. Aug. 8, 2017). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Kosilek*, 774 F.3d at 82 (*quoting Gaudreault v. Municipality of Salem, Mass*., 923 F.2d 203, 208 (1st Cir.1990)).

Here, plaintiff has failed to establish either of the two prongs. The treatment notes show that LeBaron complained about urinating blood and clots in February of 2014, but the urinalysis performed showed no evidence of blood or any other irregularities. Plaintiff then produced a sample of purple colored liquid that he claimed was urine, but when tested, was negative for blood. A urinalysis done on March 4, 2014, came back positive for blood in plaintiff's urine, but negative for any other abnormalities. The next day LeBaron met with the doctor, who scheduled plaintiff to have his blood and urine retested with a follow-up two weeks later. The record does not support a finding that plaintiff had a serious medical need. A doctor took a conservative approach, ordering that plaintiff's blood and urine be retested before determining what course of treatment, if any, need be taken.

Similarly, the record shows that medical staff responded to plaintiff's sick call request forms. Dr. Berggren has opined that "[t]he mental health providers at MCI-Shirley provided [plaintiff] with the care clinically indicated for his conditions and were not deliberately indifferent to [plaintiff's] serious medical needs." (#184, Exh. B ¶ 17.) Apart from his bald assertions that he had medical problems that were being ignored and that he was being labelled with a manufactured mental health diagnosis, plaintiff has supplied no facts to show that medical and mental health staff were deliberately indifferent to his medical needs. LeBaron has failed to raise a triable issue of fact on his Eighth Amendment claim.

In sum, defendants are entitled to the entry of summary judgment in their favor on Count Three.

4. <u>Count Four – Section 1985</u>.

In Count Four, plaintiff contends defendants engaged in "Title 42 U.S.C. § 1985 conspiracies to violate each of plaintiff's rights." (#1-2 at 29.)

> Section 1985(3) prohibits two or more persons in any State or Territory from conspiring to deprive any person or class of persons of the equal protection of the laws. As we have explained, a claim under § 1985(3) has four elements: First, the plaintiff must allege a conspiracy; second, he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; third, he must identify an overt act in furtherance of the conspiracy; and finally, he must show either injury to person or property, or a deprivation of a constitutionally protected right.

*LeBaron*, 527 F. App'x. at 33 (internal punctuation, quotation marks, and citations omitted). According to LeBaron, he was born a Mormon Fundamentalist, allegedly "a hated group of people" who, as a class, have been subjected to "historical discrimination" and so are protected from "conspiracies formed against them on the basis of their religion." (#1-2 ¶¶ 173-74.) The litany of purported conspiracies is lengthy. (#1-2 ¶¶ 175-92.) The allegations, however, are vague and conclusory. By way of example, plaintiff alleges as follows: "Each defendant conspired against plaintiff to deny him Due Process, Equal Protection of the laws and Equal Privileges & Immunities under the laws so they could have their way with him and punish him for asserting his rights because they hate his religion and everything he stands for." (#1-2 ¶ 178.)

What is missing from the complaint is sufficient factual support for the claimed conspiracies. The First Circuit has stated, "[t]hough we are mindful that pro se complaints are to be read generously, allegations of conspiracy must nevertheless be supported by material facts, not merely conclusory statements." *Slotnick v. Garfinkle*, 632 F.2d 163, 165–66 (1st Cir. 1980); *Hudson*, 94 F. Supp. 3d at 70. Faced with a motion for summary judgment, plaintiff has produced

no facts or evidence to establish a conspiracy, a conspiratorial purpose or an act in furtherance of the conspiracy. "While 'conspiracy is a matter of inference, summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations.'" *LeBaron*, 527 F. App'x. at 33 (*quoting Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir.2008)). Here, the conclusory allegations in plaintiff's complaint are not enough.

Summary judgment should enter for the defendants on Count Four.

B. State Claims.

1. Supplemental Jurisdiction.

Having recommended that all of the federal claims be dismissed, the question arises whether the court should exercise supplemental jurisdiction over the remaining state law claims. The First Circuit has quite recently noted:

> [T]he Supreme Court has instructed that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.' *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S. Ct. 614, 98 L.Ed.2d 720 (1988); *see also* 28 U.S.C. § 1367(c)(3).

> In accord with that guidance, moreover, we have held that, when all federal claims have been dismissed, it is an abuse of discretion for a district court to retain jurisdiction over the remaining pendent state law claims unless doing so would serve 'the interests of fairness, judicial economy, convenience, and comity.' *See Desjardins v. Willard*, 777 F.3d 43, 45-46 (1st Cir. 2015) (citation omitted); *Rivera-Díaz v. Humana Ins. of Puerto Rico, Inc.*, 748 F.3d 387, 392 (1st Cir. 2014). We have also held that, under this standard, it can be an abuse of discretion—if no federal claim remains—for a district court to retain jurisdiction over a pendent state law claim when that state law claim presents a substantial question of state law that is better addressed by the state courts. *Desjardins*, 777 F.3d at 45-46.

*Wilber v. Curtis*, 872 F.3d 15, 23 (1st Cir. 2017); *see also Senra v. Town of Smithfield*, 715 F.3d 34, 41 (1st Cir. 2013) ("[T]he termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an

exercise of the court's informed discretion.") (*quoting Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 256–57 (1st Cir. 1996)).

In this instance, the case has been pending for over three years and has traveled something of a tortured path. Discovery is complete, and the motion for summary judgment has been pending since October 2017. The issues raised by the dispositive motion at hand may readily be addressed; no "substantial question of state law" needs to be resolved. It serves the interests of judicial economy and the convenience of the parties for the court to exercise supplemental jurisdiction. In short, consideration of the relevant factors warrants the exercise of the court's discretion to retain supplemental jurisdiction.

## 2. <u>Massachusetts Civil Rights Act (MCRA)</u>.

In pertinent part, the MCRA provides:

> Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured.

Mass. Gen. L. c. 12, § 11H. The statute additionally provides that individuals who are aggrieved in the manner described in § 11H may bring civil actions in their own names for their own benefit. Mass. Gen. L. c. 12, § 11I. "The MCRA is coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not, and the derogation of secured rights must occur by threats, intimidation, or coercion." *Sietins v. Joseph*, 238 F. Supp. 2d 366, 377-78 (D. Mass. 2003) (quotations and citations omitted); *Nolan v. CN8*, 656 F.3d 71, 76 (1st Cir. 2011); *Diaz v. Devlin*, 229 F. Supp. 3d 101, 112 (D. Mass. 2017).

No discussion of the MCRA claims is required. Having determined that defendants are entitled to summary judgment on all of the federal § 1983 claims, it follows that they are entitled to summary judgment on the MCRA claims as well.

## V. Recommendation.

For the reasons stated, I RECOMMEND that Defendants' Motion for Summary Judgment (#182) be ALLOWED.

## VI. Review by District Court Judge.

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The objections must specifically identify the portion of the recommendation to which objections are made and state the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Federal Rules Civil Procedure, shall preclude further appellate review. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).


December 1, 2017

/s/ M. Page Kelley
M. Page Kelley
United States Magistrate Judge